UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JAMES BERRY,

                    Plaintiff,

v.                                    Case No. 3:10-cv-228-J-37JRK

MARK GORSAGE, et al.,

                    Defendants.

_____

**ORDER**

**I.   Status**

    Plaintiff James Berry, in his civil rights Complaint (Doc. #1)
(hereinafter Complaint), names Mark Gorsage, a former K-9 officer
for the Jacksonville Sheriff's Office (hereinafter JSO), and Jason
Royal, a patrol officer for JSO, as Defendants.[1]  Plaintiff claims
the Defendants subjected him to the excessive use of force and they
failed to intervene to prevent the excessive use of force.
Defendants, Mark Gorsage and Jason Royal's Motion for Summary
Judgment (Doc. #48) (Motion for Summary Judgment) and Defendants,
Jason Royal and Mark Gorsage's Notice of Filing Redacted Exhibits
(Doc. #49) are before this Court.[2]  Plaintiff has filed his Written

_____

    [1] Defendant JSO Officer Nancy Tollinchi was dismissed as a
Defendant (Doc. #36).

    [2] The Defendants' Exhibits will hereinafter be referred to as
"Ex."

Opposition to Defendants' Motion for Summary Judgment (Doc. #60) (Response).  See Order (Doc. #17).

## II.  Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Crawford v. Carroll, 529 F.3d 961, 964 (11th. Cir. 2008) (citing Fed. R. Civ. P. 56(c) and Wilson v. B/E/Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)).

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Allen v. Bd. of Pub. Educ. for Bibb County, 495 F.3d 1306, 1313 (11th Cir. 2007) (citations omitted).

> "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324, 106 S.Ct. 2548).[3]

Id. at 1314.

---

[3] Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

### III.  The Complaint

For convenience, a summary of the allegations raised in the Complaint is provided.  At approximately noon on May 12, 2008, Defendant Officer Tollinchi was dispatched to a suspicious incident at Paddock Club Apartments, located in Jacksonville, Florida. Complaint at 8.  Defendant Tollinchi was directed, by dispatch, to a parked vehicle in the parking lot.  Id.  Officer Bawroski also arrived at the scene, pulling his vehicle in front of Plaintiff's vehicle.  Id.  Defendant Tollinchi approached the driver's side of the vehicle, and Officer Bawroski approached the front passenger side of the vehicle.  Id. at 8-9.  Plaintiff was in the driver's side of the vehicle, and Warren Johnson was in the front passenger seat.  Id. at 9.

Defendant Tollinchi asked Plaintiff to step out of the vehicle, and he did so.  Id.  Plaintiff gave verbal consent to search his person.  Id.  Officer Tollinchi conducted a pat search, recovering a pair of black gloves from Plaintiff's left rear pants' pocket.  Id.  Officer Tollinchi rechecked Plaintiff's pockets and found his driver's license in his left front pants' pocket.  Id.

At that point, Plaintiff pushed off of the vehicle, and began running away from Officer Tollinchi.  Id.  Officer Bawroski secured suspect Johnson in his patrol vehicle.  Id.  Officer Bawroski assisted Officer Tollinchi in a foot pursuit of Plaintiff.  Id. When Officer Tollinchi lost sight of Plaintiff, she called for a K-

9 unit to respond to the scene.  <u>Id</u>.  While waiting for the K-9
unit, Officer Tollinchi searched the vehicle, finding a firearm.
<u>Id</u>.

Shortly thereafter, Officer Gorsage arrived at the scene, and
Officer Tollinchi advised him of the situation, telling him that
one suspect was in custody, one ran away, a firearm was found in
the suspects' vehicle, a pat search was conducted on the suspect-
Plaintiff, with the suspect-Plaintiff still at large.  <u>Id</u>. at 9-10.
Thirty minutes later, Officer Gorsage's K-9 picked up an air scent
and located Plaintiff lying down in some palmetto bushes in the
apartment complex.  <u>Id</u>. at 10.  Without warning, Officer Gorsage
released the K-9.  <u>Id</u>.  The K-9 attacked Plaintiff, biting him.
<u>Id</u>.  Plaintiff screamed for help.  <u>Id</u>.  Officer Gorsage, from
approximately twenty yards away, slowly approached Plaintiff,
accompanied by Officer Royal.  <u>Id</u>.  Officer Royal was armed with an
assault rifle.  <u>Id</u>.

Once in close proximity to Plaintiff, Officer Gorsage observed
Plaintiff's hands in the air, apparently unarmed.  <u>Id</u>.  Defendant
Gorsage was reluctant to give his K-9 a verbal command to desist.
<u>Id</u>.  He allowed the K-9 to continue to attack Plaintiff.  <u>Id</u>.
Plaintiff was screaming in pain.  <u>Id</u>. at 11.  He reached his hands
out for help from defendant Gorsage.  <u>Id</u>.  Upon coming into contact
with Defendant Gorsage, Plaintiff was struck multiple times in the
face with the butt of Officer Royal's assault rifle.  <u>Id</u>.  Officer

- 4 -

Gorsage pulled the K-9 off of Plaintiff, and Plaintiff was handcuffed. Id.

Once Plaintiff was placed in Officer Tollinchi's vehicle, a paramedic was called to the scene. Id. Plaintiff suffered dog bites and lacerations from being assaulted with the rifle. Id. "The paramedic indicated that plaintiff was 'alright', without regard to Plaintiff bleeding profusely." Id.

Officer Tollinchi transported Plaintiff to the Police Memorial building for questioning. Id. Plaintiff complained to Defendant Tollinchi that he was in serious pain, bleeding and having trouble breathing. Id. After leaving the Police Memorial Building, Plaintiff told Officer Tollinchi that he needed to see a doctor. Id. She ignored Plaintiff's pleas for medical attention and transported Plaintiff to the jail for booking. Id.

County jail officials refused to book Plaintiff, as he had been bitten and beaten, and he was bloody with exposed lacerations. Id. at 12. After the prolonged delay in medical care, Officer Tollinchi finally transported Plaintiff to the emergency room of the hospital. Id. As a result of his injuries, Plaintiff underwent surgery. Id.

In support of the Complaint and in response to Defendants' Motion for Summary Judgment, Plaintiff has provided two declarations, Exhibit A (Declaration of James Berry Against Mark Gorsage-Defendant) and Exhibit B (Declaration of James Berry

Against Jason Royal-Defendant), attached to his Response.    In

Exhibit A (enumeration omitted), Plaintiff attests:

> On May 12, 2008 I was sitting in the driver[']s seat of a parked vehicle in the Paddock Club Apartments.
>
> Officer Tollinchi drove her police cruiser past and parked a few spaces down from the vehicle I was positioned in.
>
> Officer Bawroski approached from behind Officer Tollinchi[']s vehicle and positioned his patrol cruiser directly into the front of the vehicle I was sitting in.
>
> At this exact moment Officer Tollinchi approached the driver's side of the veihicle [sic] and Bawroski approached the passenger[']s side.
>
> I was instructed to step out of the vehicle by Officer Tollinchi.
>
> Officer Tollinchi performed what she later described as a "pat search["] for officer safety reasons which exceedingly escalated in her reaching into my pockets retrieving items out of them.  At this point I fled away from Officer Tollinchi.
>
> While I was laying on the ground in "no" position to launch any ambush attack, Officer Gorsage unleashed his K-9 without warning.
>
> Appro[a]ching in from approxamitely [sic] twenty yards away after noticing that I was unarmed, Officer Gorsage fail[ed] to call the K9 off.
>
> After finally deciding he was ready to take the dog off, Officer Gorsage stood by as he allowed Officer Royal to strike me twice in the face with his assault rifle.

In Exhibit B (enumeration omitted), Plaintiff attests to the following:

On M[a]y 12, 2008 I was sitting in the driver['s] seat of a parked vehicle in the Paddock Club Apartments.

Officer Tollinchi drove her police cruisier [sic] past and parked a few spaces down from the vehicle I was positioned in.

Officer Bawroski approached from behind Officer Tollinchi[']s vehicle and positioned his patrol cruiser directly into the front of the veihicle [sic] I was sitting in.

At this exact moment Officer Tollinchi approached the driver[']s side of the veihicle [sic] and Bawroski approached the passenger[']s side.

I was instructed to step out of the vehicle by Officer Tollinchi.

Officer Tollinch[i] performed what she described as a pat search for officer safety reasons which exceedingly escalated in her reaching into my pockets retrieving items out of them. At this point I fled from Officer Tollinchi.

While I was laying on the ground in "no" position to launch any ambush attack, Officer Gorsage unleashed his K-9 without warning.

Approachin[g] in from approxamitely [sic] twenty yards away after noticing that I was unarmed, Officer Gorsage fail[ed] to call the K-9 off. And at this exact moment Officer Royal fail[ed] to entervene [sic] and instruct Officer Gorsage to cease his attack.

After finally deciding to cease [the] attack of the K9, Officer Royal struck me twice in the face with his assault rifle.

- 7 -

## IV.  Defendants' Motion for Summary Judgment

In support of their Motion for Summary Judgment, Defendants have submitted Declarations; the Deposition of Plaintiff; photographs of Plaintiff's dog bite injuries; some medical records; and the sworn testimony of Jason Royal from Plaintiff's March 19, 2009, criminal trial.[4]  In her Declaration, Nancy Tollinchi submits:

> On May 12, 2008 I responded to a call at the Paddock Club Apartments in Jacksonville, FL.  Officer Bawroski also responded to this call.
>
> Someone had called JSO and complained that there was an unfamiliar car in the parking lot, with two men inside.  The car had been there for approximately four hours.
>
> I approached the car in question and spoke to the driver.  I asked him if he lived at the apartment complex.  He said that he did not.
>
> I then asked him if he knew someone who lived at the complex.  He said that he did not.
>
> Smelling the odor of marijuana in the car, I asked the driver for identification. He said that he had none on his person.
>
> When he could not produce identification, I asked the driver to exit the car.  He complied.

---

[4] Plaintiff is currently serving a sentence of fifteen years for possession of a firearm by a felon, two eight-year sentences for battery on a law enforcement officer, and two eight-year sentences for resisting an officer with violence, all with an offense date of May 12, 2008, the date of this incident.  See http://www.dc.state.fl.us/ActiveInmates/detail.

I asked the driver if I could search him for his safety and mine.  He assented.

I began to do a pat-down search.  Before I could finish, the driver, later identified as James Berry, pushed away from the vehicle and ran.

I tried to catch Berry, but due to a leg injury, I could not.

I then searched the car, and found a loaded handgun under the driver's seat.

Shortly thereafter, Officer Gorsage and his K-9 responded to my call for backup. Officer Royal also responded to my call for backup.

I informed the officers of my search and the gun I had found.

I next saw Berry after he had been taken into custody.  He had been injured after running from the police.

I called rescue, and a unit of the Jacksonville Fire & Rescue Division ("JFRD") responded.

A JFRD medic examined Mr. Berry, and said that he was "alright," and need not be transported to the hospital.

I then transported Berry to the Police Memorial Building for questioning.

Ex. 1 (enumeration omitted).

In Mark Gorsage's Declaration, he attests:

From April 30, 1979 to October 3, 2008, I was an officer with the Jacksonville Sheriff's Office ("JSO").

From February of 1993 to October 3, 2008, I was a K-9 officer with the JSO.

- 9 -

On May 12, 2008 I was on duty as a K-9 officer. My actions that day are described more fully in my K-9 Report, which is attached to this Declaration, and incorporated by reference.

I was called to the Paddock Club Apartment with my K-9 dog to search for a suspect who had run from the police.

JSO Officer Tollinchi told me that she had been patting down the suspect when he fled.

She also told me that she had found a gun in the car the suspect had been driving.

After a thirty minute search, my K-9 air-scented the suspect. He was laying down in a grove of palmetto bushes.

I released my K-9, who ran to the suspect and applied pain compliance.

The suspect fought the dog. I approached warily, as it was unclear to me whether the suspect was armed.

When I got close to the suspect, I advised him multiple times to stop fighting the dog and I would get the dog off of him.

As I released the K-9, the suspect then grabbed my forearm and gun belt and attempted to pull me down to the ground.

At this point, Officer Royal struck the suspect multiple times with knee-strikes to the suspect's forehead.

The suspect then ceased resisting and was handcuffed.

I then took my K-9 dog and left the scene.

Ex. 2 (enumeration omitted).

The Canine Report of the Office of the Sheriff, dated May 12, 2008, states:

> This canine team responded at the request of patrol officers to assist in searching for the listed suspect who fled on foot from officers inside the Paddock Club Apartments, 7925 Merrill road[.]   The officers advised that the listed suspect and another black male were seen in a vehicle in the apartments since approximately 0800[.]  The suspects were also looking into several vehicles and walking through the complex[.]   The officers also advised that there have been numerous robberies within the complex[.]   Upon observing the officers approaching, both suspects fled[.]  The listed suspect was not captured[.]   The second suspect was arrested by patrol officers[.] A search of the vehicle revealed a Taurus 9 mm pistol, black gloves, a black sweatshirt with a hood, a wig and a roll of duct tape[.]

> Upon arrival PSD Dutch was deployed on an on-leash area search and air-scented the suspect who was concealing himself in some palmetto bushes[.] The following factors were considered prior to deploying the PSD[:]

> 1) The suspect was wanted for carrying a concealed firearm[;]
> 2) The suspect refused orders by uniformed officers to surrender[;]
> 3) It was unknown if the suspect was armed upon fleeing[.]

> No canine announcement was given due to firearms being involved and the possibility of an ambush[.]

> PSD Dutch was deployed and engaged the suspect[.]   The suspect began striking the PSD[.]    The suspect was ordered to stop striking the PSD and the suspect complied[.] The PSD was then released[.] The suspect then grabbed this officer['] s right forearm and attempted to pull me to the ground[.]  I then

- 11 -

pulled free and the suspect then attempted to grab officer Royal[.] Officer Royal applied a knee strike to the suspect's forehead[.] At this time[,] the suspect complied with orders to surrender and stop resisting[.]

As a result of the engagement[,] the suspect sustained minor punctures to his left thigh[.] The suspect was treated at the scene by rescue and transported to Shands by patrol[.]

Sergeant Lentz was advised of the incident[.]

Sergeant Miller took photographs of the suspect's injuries[.]

Animal investigation ccr#460825[.]

The suspect was also charged with possession of a firearm by a convicted felon[.]

Id., Canine Report.

In the Declaration of Jason Royal, he attests:

I have been a member of the JSO for 20 years.

On May 12, 2008 I responded to the call for backup at the Paddock Club Apartments in Jacksonville, FL.

When I arrived at the scene, I provided backup to K-9 Officer Gorsage.

At the scene, Officer Tollinchi informed us that she had found a gun in the suspect's car.

Officer Gorsage and I searched for the suspect, along with JSO K-9 Dutch.

After approximately 30 minutes, K-9 Dutch picked up the scent of the suspect.

Because we did not know whether the suspect was armed or not, Officer Gorsage took Dutch off lead and Dutch located the suspect in a stand of palmetto bushes.

K-9 Dutch applied pain compliance measures.

Officer Gorsage and I approached and could see the suspect fighting with K-9 Dutch.

As we got close to the suspect, the suspect grabbed Officer Gorsage's arm and gunbelt and began to struggle with him.

Officer Gorsage repeatedly commanded the suspect to let go, or he would not release the dog.

At they continued to struggle, in accordance with my police training I applied two knee strikes to the suspect's forehead.

Shortly after the knee strikes, the suspect stopped struggling with Officer Gorsage, who immediately ordered Dutch to cease his engagement with the suspect.

I then handcuffed the suspect, who I later learned was James Berry, and placed him under arrest.

Mr. Berry was examined by Fire & Rescue medical personnel for his wounds, who said that Berry was alright, and did not need to go to the hospital.

I then left the scene.

Ex. 7 (enumeration omitted).

The medical records and the photographs record the superficial puncture wounds and abrasions from the dog bites to Plaintiff's arm and legs. Ex. 4; Ex. 5; Ex. 6. There was no active bleeding when Plaintiff was seen at Shands Hospital on May 12, 2008. Ex. 5.

Plaintiff was sent for x-rays and received pain medication.  Id.
During follow-up care on May 15, 2008, it was recorded that the dog
bites did not require wound care.  Ex. 6.  There was facial
bruising, and Plaintiff was provided with a nasal splint.  Id.  The
doctor prescribed Keflex, Lortab, and Naproxan.  Id.

In his deposition taken on September 8, 2011, Plaintiff states
that there was a pat-down search and he ran from Officer Tollinchi.
Ex. 3 at 22-26.  He ran behind an apartment building and laid down
amongst the trimmed palmetto trees.  Id. 28-30.  After some time,
the police dog arrived.  Id. at 30.  Plaintiff realized it was a
police dog when it began biting him.[5]  Id. at 32.  Based on
instinct, he began defending himself against the dog.  Id. at 33.
He wrestled the dog, trying to get the dog off of him.  Id.  The
dog first bit Plaintiff's chest, and then ended up at his legs.
Id.

Officer Gorsage arrived to take the dog off.  Id.  He was
right up on Plaintiff.  Id. at 34.  Plaintiff had his hands in the
air, he was screaming, and he was trying to defend himself from the
dog.  Id. at 33-34.  Gorsage took the dog off.  Id. at 34.
Plaintiff put his hands up.  Id.  When asked whether he grabbed
Officer Gorsage, Plaintiff responded that he does not recall that

---

[5] Plaintiff admits that he previously had the experience of
being bitten by a police dog years prior to this incident.  Ex. 3
at 30-31.

part.  Id.  When asked whether he made contact with Officer Gorsage, Plaintiff said he does not recall, but he put his hands out to whoever was there.  Id. at 35.  Officer Royal was pointing his gun at Plaintiff and was standing next to Officer Gorsage as Gorsage was taking the dog off.  Id. at 37.  Officer Royal swung the rifle around and hit Plaintiff twice in the face with the assault rifle.  Id. at 34, 36, 37.

Plaintiff suffered a broken nose, had facial surgery, and was placed on pain medication.  Id. at 41-42, 45-46.  The wounds from the dog bites were cleaned and Plaintiff was provided with patches and creams.  Id. at 45.  The dog bites did not require stitches. Id.

Officer Royal, in his sworn testimony at Plaintiff's criminal trial, attested to the following.  On May 12, 2008, he was summoned to the scene and advised that a possible suspect was running from the police.  Ex. 8 at 5-6.  He was notified that a fleeing person was a possible robbery suspect and a firearm had been located in the vehicle from which the suspect fled.  Id. at 6.  He was informed of the direction the suspect traveled.  Id.  He received a description of the suspect and his clothing.  Id. at 6-7.  His role was back-up officer.  Id. at 7.  He was backing up the dog handler, Officer Gorsage.  Id.  Officer Royal followed behind Officer Gorsage and the dog.  Id. at 8.

The dog alerted and engaged the suspect.  Id.  Officer Royal described the encounter with the suspect:

> Well, the dog located him in a patch of palmetto bushes, so you couldn't really see exactly, you know, where he was hiding.  It was pretty secluded.  The dog went in and engaged him on the leg.  Myself and Officer Gorsage moved in.  We were giving him commands to stop resisting, show us your hands.  He continued for a brief second, appeared to be stopping.  At that time Officer Gorsage took control of the dog by grabbing him by the collar and that's when the defendant grabbed Officer Gorsage.  Officer Gorsage, you know, hollered for him to let him go.  At that time I intervened and struck the -- grabbed the suspect by the head and knee'd him twice and was able to break him free from Officer Gorsage.

Id. at 8-9.

All of the officers were in uniform.  Id. at 9-10.  Officer Royal explained that he teaches defensive tactic techniques at the police academy, and that he chose to intervene and use the knee strikes because the suspect "was obviously pulling Officer Gorsage to the ground and we're taught that the worst place that a police officer could be when they're engaged on a suspect is on the ground because you're not able to pull all of this stuff off of your belt and defend yourself."  Id. at 10.  His knee strike cut Plaintiff's forehead.  Id. at 12.

Officer Royal explained that he was wearing a one-point sling on the rifle, and he slung the rifle around his back, out of the way, prior to the knee-strikes.  Id. at 18.  He said he intervened

- 16 -

because Plaintiff was grabbing Officer Gorsage's arm.  Id. at 19.
Plaintiff was being bitten by the dog and screaming as he was
grabbing for Officer Gorsage.  Id.  After Officer Royal struck
Plaintiff a couple of times, Plaintiff complied with the officers'
orders, and he was taken into custody.  Id.

Officer Royal said it appeared that the suspect was reaching
and grabbing at Officer Gorsage's waist, where Gorsage's gunbelt
was located.  Id. at 14.  Officer Royal claimed he had information
that the suspect had pushed or shoved Officer Tollinchi.  Id.
Finally, Officer Royal attested that he was familiar with the
apartment complex, and that during the two-week period immediately
prior to this incident, there had been reports of numerous armed
robberies inside of the complex.  Id. at 15.

## V.  The Law

Plaintiff has presented this Court with a Fourth Amendment
claim of excessive force. Simply, "a police officer must not use
excessive force in the course of an arrest." Grimes v. Yoos, 298
Fed.Appx. 916, 921 (11th Cir. 2008) (per curiam) (not selected for
publication in the Federal Reporter) (citing Graham v. Connor, 490
U.S. 386, 388, 394-95 (1989)).  Plaintiff has also asserted a
failure to intervene; "[a] police officer with the ability to do so
must intervene to stop another police officer's use of excessive
force." Id. (citing Priester v. City of Riviera Beach, Fla., 208

F.3d 919, 924-25 (11th Cir. 2000)). This Court must review the use of force claim with objective reasonableness. Indeed,

> Determining whether the force used was reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake. Tennessee v. Garner, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); Crosby v. Paulk, 187 F.3d 1339, 1351 (11th Cir. 1999). Therefore, "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting Graham, 490 U.S. at 396, 109 S.Ct. 1865). "A constitutional violation occurs when the officer's use of force is 'objectively unreasonable' in light of the totality of the circumstances at the time the force is used." Graham, 490 U.S. at 396, 109 S.Ct. 1865.

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), "its proper application requires careful attention to the facts and circumstances of each particular case," including (**1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.** Graham, 490 U.S. at 396, 109 S.Ct. 1865. In addressing these three factors, the Court should consider **the need for the application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted.** Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002).

Pace v. City of Palmetto, 489 F.Supp.2d 1325, 1331 (M.D. Fla. 2007) (emphasis added), judgment aff'd, Pace v. Ahler, 282 Fed.Appx. 769 (11th Cir. 2008) (not selected for publication in the Federal Reporter).

First, the Court looks to the severity of the crime at issue. There had been reports of numerous armed robberies in the apartment complex for the two-week period prior to this incident. The officers were sent to the complex when someone reported to the Jacksonville Sheriff's Office that there was an unfamiliar car in the apartment complex parking lot with two men inside. Additionally, it was reported that the car had been there for approximately four hours. Officer Tollinchi smelled marijuana coming from the car. While she was conducting a pat-down search of Plaintiff Berry, he fled. A loaded handgun was found under the driver's seat of the vehicle, and Plaintiff Berry was the driver. Officer Tollinchi informed Officer Gorsage and Royal that she had been patting Plaintiff down when he fled, and she informed the officers that she had found a gun in the car.

In the Canine Report, it was noted that the suspects had been looking into several vehicles and walking through the complex. The officers were advised of the numerous recent robberies within the complex. The vehicle contained a Taurus 9 mm pistol, black gloves, a black sweatshirt with a hood, a wig and a roll of duct tape. Apparently, Plaintiff was wanted for carrying a concealed firearm

and it was unknown if he was armed when he fled.  Officer Royal attested that he was informed that the fleeing suspect was a possible robbery suspect and a firearm had been found in the vehicle from which he had fled.

Under these circumstances, it was reasonable for the officers to suspect that Plaintiff had committed or participated in serious crimes.  Additionally, Plaintiff had fled from the police during a pat-down search and was eluding capture.

Second, it was reasonable for the officers to believe that Plaintiff Berry posed an immediate threat to the safety of the officers and the safety of others.  Plaintiff fled during the pat-down search, and it was possible that he was armed.  A weapon was found in the vehicle he was driving, under the driver's seat.  The fact that Plaintiff fled, refused to surrender, and remained hidden for thirty minutes certainly gave the officers reason to be concerned that Plaintiff may have concealed a weapon on his person or he may have a hidden weapon in the area.  The officers rightly feared an ambush and the possibility of firearms being involved.  Also, the officers reasonably suspected that Plaintiff Berry may have been involved in a series of armed robberies in the apartment complex.  Finally, apparently Plaintiff was wanted for carrying a concealed firearm.

Third, there is absolutely no question that Plaintiff was attempting to avoid arrest by fleeing.  During the pat-down search

by Officer Tollinchi, Plaintiff decided to flee from the police, and he ran behind the apartment building and hid in a grove of palmetto bushes.  He was able to remain concealed for approximately thirty minutes.  Under these circumstances, it was objectively reasonable for a K-9 to be deployed to track him.

The lack of warning of deployment of a canine alone does not constitute a constitutional violation.  Dawe v. Rogers, No. 8:09-cv-620-T-30AEP, 2010 WL 271435, at *5 (M.D. Fla. Jan. 15, 2010) (not reported in F.Supp.2d) (citing Pace v. City of Palmetto, 489 F.Supp.2d 1325, 1330-36 (M.D. Fla. 2007)).  Additionally, it does not constitute a constitutional violation to use a police dog that has been trained to bite and hold to track a fleeing suspect.  Id. The fact that the dog has been trained to initiate pain compliance does not amount to a constitutional violation; "[t]he bite and hold training method is not unconstitutional.  Nor is it objectionable unreasonable."  Pace, 489 F.Supp.2d at 1333.  It is also objectively reasonable for a police officer not to announce his position when attempting to utilize a canine to capture a fleeing suspect, particularly when the individual is an armed robbery suspect that may be armed and dangerous.  Crenshaw v. Lister, 556 F.3d 1283, 1293 (11th Cir. 2009) (per curiam).

There was no constitutional violation when Defendant Gorsage decided to use the dog to track Plaintiff or to release the dog. Here, Defendant Gorsage was not required to place his own life, the

lives of other officers, or the lives of the public, at risk by revealing his position by shouting warnings as he tried to find the Plaintiff.   The officers were aware that Plaintiff had fled from the police during a pat-down search and a firearm was found in his vehicle.   Additionally, it was not known whether Plaintiff was armed or might have access to firearms.  It was entirely reasonable for the officers to fear an ambush under the circumstances presented by Plaintiff fleeing behind the apartment, hiding for quite some period of time, and failing to surrender to the police.

The next issue is whether there was a need for the application of force and the relationship between the need and amount of force used, and the extent of the injury inflicted.  Plaintiff's injuries from the dog bites were superficial.  The dog's biting and holding Plaintiff did not result in severe injuries.   At most, he had abrasions and puncture wounds, none of which required stitches. The Fire and Rescue medics determined that Plaintiff was alright and did not need to be sent immediately to a hospital.  By the time Plaintiff arrived at the hospital, there was no bleeding from the dog bites.  They were cleansed and dressed and no further treatment was needed.   The pictures of the wounds from the dog bites support the conclusion that these were superficial wounds.  The use of the dog and the timing of the removal of the dog did not amount to the excessive use of force in violation of the Fourth Amendment. Indeed, the decision to use the dog to track, find and perform

"pain compliance measures" on Plaintiff resulted in a use of force that was entirely reasonable under these particular circumstances.

The officers faced a rather volatile situation, coming upon Plaintiff hiding in the palmetto bushes, fighting the dog.  It is undisputed that when the dog began biting, Plaintiff began defending himself against the dog.  Plaintiff admitted wrestling with the dog.  It was reasonable for Officer Gorsage to approach Plaintiff warily, trying to determine whether Plaintiff had a weapon or had access to a weapon.  When Gorsage approached, Plaintiff was screaming and wrestling with the dog.  When Plaintiff appeared to stop fighting the dog, Gorsage removed the dog by grabbing the dog's collar.  There was some contact between Gorsage and Plaintiff.  Plaintiff contends this was, at most, incidental contact when he raised his hands towards Gorsage.  Plaintiff did not recall grabbing Officer Gorsage.  Officer Royal observed the contact, which he perceived as Plaintiff grabbing Officer Gorsage, and saw Officer Gorsage going down towards the ground.  Officer Royal had been trained that this was the worst possible situation for a police officer because the officer would be unable to defend himself by reaching the equipment on his belt.  Officer Royal intervened, concluding that Officer Gorsage was in danger, going to the ground.

At this point, Officer Royal struck Plaintiff multiple times, either with his rifle,[6] as alleged by Plaintiff, or with his knee, as contended by Officers Royal and Gorsage.  These strikes did result in a severe injury, a broken nose, which required surgery. However, the undisputed material facts demonstrate that the use of this force and the severity of Plaintiff's injuries were the direct result of Plaintiff's decision to flee from police, to hide behind the apartment building in the palmetto bushes for a lengthy period of time without surrendering, to fight the police dog, and to engage the K-9 officer, resulting in the officer going down towards the ground, in a precarious position.

This Court must give a measure of deference to the judgment of the police in this "tense, uncertain and rapidly evolving" situation.  Graham v. Connor, 490 U.S. 386, 396-97 (1989).  Officer Royal had to make a split-second judgment to intervene, facing a situation that was fraught with danger.  In light of the totality of the circumstances, Officer Royal's action of striking Plaintiff multiple times, either with a rifle or his knee, did not constitute excessive force and did not violate Plaintiff's Fourth Amendment rights.

---

[6] It is not *per se* unconstitutional to repeatedly strike a suspect with the butt of a service rifle, particularly when an officer is faced with a confusing situation, a reluctant suspect, and potential danger.  Walker v. City of Orlando, 368 Fed.Appx. 955, 956 (11th Cir. 2010) (per curiam) (not selected for publication in the Federal Reporter).

Also, with regard to the claim of failure to intervene, under the circumstances presented to these officers, they did not commit a Fourth Amendment violation for failure to intervene, either in failing to intervene to prevent the dog from biting or in failing to intervene to prevent the rifle or knee strikes.

Defendants have asserted that they are entitled to qualified immunity.  Providently, the Eleventh Circuit just issued its decision in <u>Edwards v. Shanley</u>, No. 11-11512, 2012 WL 89193 (11th Cir. Jan. 12, 2012) (reversing a decision by the District Court granting qualified immunity to police officers in a case where the police officers allowed a police dog to conduct a five-to-seven minute attack against a fleeing suspect, who was lying face down with his hands exposed, non-resistant and pleading with the officers to call off the dog), a Fourth Amendment police dog attack case.  The Eleventh Circuit reiterated the two-step process for analyzing claims under qualified immunity: "Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right." <u>Id</u>. at *3 (citing <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1329 (11th Cir. 2008)).

As in <u>Edwards</u>, there is no dispute that the police officers were acting within their discretionary authority while tracking and arresting Plaintiff.  At this stage, however, Plaintiff must show

that qualified immunity should not apply.  This too requires a two-step process, with the Court inquiring as to whether the defendants' conduct amounted to a constitutional violation, and then determining whether the right was clearly established at the time of the violation.  In the instant case, the Court has found that the Defendants did not subject Plaintiff to a Fourth Amendment violation.  Therefore, the Court need not reach the second step of the analysis.

Furthermore, this case is distinguishable from <u>Edwards</u> in that Officer Gorsage did not permit the dog to attack Plaintiff for a lengthy period of time.  In <u>Edwards</u>, the dog attack lasted for five to seven minutes, resulting in significant damage to the suspect's muscles and tendons which required urgent surgery, a six-day hospital stay, and extensive follow-up care.  On the contrary, in this instance, Plaintiff Berry had a very brief encounter with the dog, which was extended slightly by Plaintiff wrestling and fighting the dog.  He suffered very minor, superficial wounds from the dog bites, which required no follow-up care.  Officer Gorsage stepped in and removed the dog by the collar when he thought he could safely give effect to Plaintiff's apparent surrender.  "[I]t was appropriate to employ extraordinary but non-deadly force in this instance[,]" <u>id</u>. at *4, but, there was no gratuitous and sadistic infliction of pain by allowing the dog to maim the Plaintiff.

As for the second prong, which this Court is not required to reach since the Court has found no constitutional violation, clearly established law does not prohibit the police from using a dog to track and subdue a fleeing suspect. Crenshaw, 556 F.3d at 1291-93. Here, unlike Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 924 (11th Cir. 2000) (finding it unconstitutional for police officers to allow a police dog to bite and hold for two minutes where the suspect was fully compliant and not resisting), Plaintiff was non-compliant, as he was admittedly wrestling and fighting the dog, and the attack by the dog was brief, resulting in superficial wounds.

The Court has also found that there was no Fourth Amendment violation when Officer Royal employed strikes to Plaintiff when he saw Plaintiff make contact with Officer Gorsage and Officer Gorsage going down towards the ground, in very close proximity to Plaintiff, placing Officer Gorsage in a vulnerable and precarious position, without ready access to his gun belt to defend himself. Finally, neither Defendant violated the Fourth Amendment by failing to intervene to protect Plaintiff under these circumstances.

Based on the above, the Defendants' conduct did not amount to a constitutional violation, and the Defendants' Motion for Summary Judgment is due to be granted.

Therefore, it is now

**ORDERED:**

- 27 -

1.     Defendants, Mark Gorsage and Jason Royal's October 12, 2011, Motion for Summary Judgment (Doc. #48) is **GRANTED,** and the Clerk shall enter judgment for the Defendants and against the Plaintiff.

2.     The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 2nd day of February, 2012.

ROY B. DALTON JR.
United States District Judge

sa 2/2
c:
James Berry
William B. Burkett, Esquire

- 28 -